IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date:  **August 14, 2018**

**No. A-1-CA-35732**

**JESSICA CRESPIN,**

Plaintiff-Appellant,

v.

**SAFECO INSURANCE COMPANY
OF AMERICA,**

Defendant-Appellee,

and

**TRAVIS BAINBRIDGE and
FABIAN FIERRO,**

Defendants.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Nan G. Nash, District Judge**

Atkins & Walker, P.A.
Tyler J. Atkins
Samuel H. Walker
Albuquerque, NM

for Appellant

Ray, McChristian & Jeans, P.C.
Shannon A. Parden
Albuquerque, NM

for Appellee

**OPINION**

**BOHNHOFF, Judge.**

{1}    Defendants Fabian Fierro, age 18, and Travis Bainbridge, age 19, picked up Plaintiff Jessica Crespin, age 14, from her school in an uninsured vehicle. They drove to Fierro's mother's house where Fierro had sexual relations with Crespin and Bainbridge sexually assaulted her. Crespin's mother had purchased an automobile liability insurance policy issued by Safeco Insurance Company of America (Safeco) that contained uninsured motorist coverage which extended to Crespin. Crespin brought this action after Safeco denied Crespin's claim for uninsured motorist coverage for the incident. Following Crespin's presentation of her case-in-chief at a bench trial, the district court ruled in favor of Safeco and dismissed Crespin's claim for uninsured motorist coverage. Crespin now appeals. We affirm.

**BACKGROUND**

{2}    The parties do not challenge any of the district court's findings of fact, which we summarize below.

{3}    In February 2009, Crespin texted with Fierro and Bainbridge, and they made plans for the men to pick her up from her middle school the following day. Crespin had known Fierro for about three years and previously had sexual relations with him. As of the day of the text exchange, Crespin believed that Bainbridge was her

boyfriend, but she had not had sexual relations with him. Bainbridge and Fierro wanted and expected to have sexual relations with Crespin the following day but did not say this in their texts with her.

{4} The following day, Fierro drove an uninsured car owned by Fierro's mother to Crespin's school; Bainbridge was a passenger in the car. Crespin planned on going to the mall with Bainbridge and returning to school before classes let out for the day. Crespin told her teacher that she had to use the restroom; she went outside to meet Fierro and Bainbridge and willingly opened the car door and got in. Fierro and Bainbridge did not tell Crespin that they planned to have sexual relations with her before she got into or while they were riding in the vehicle. Crespin was not physically restrained or otherwise forced to stay in the car, nor was she sexually assaulted or harmed while she was in the car. Bainbridge testified that he would not have picked up Crespin from school that day if he had not had use of a car.

{5} When the three arrived at Fierro's mother's house, Crespin exited the vehicle on her own volition and entered the house with Bainbridge and Fierro. Crespin was introduced to Janet Roybal, Fierro's mother. When Crespin was introduced to Ms. Roybal she was not crying or acting afraid or distressed. Crespin, Fierro, and Bainbridge then went upstairs to talk and listen to music. Prior to going upstairs,

Bainbridge and Fierro did not tell Crespin and she otherwise did not know that they intended to have sexual relations with her.

{6}     After listening to music for about twenty minutes, Fierro and Crespin went into a different room and had sexual relations. After Fierro had sexual relations with Crespin, he fell asleep, and Crespin went into the room where Bainbridge was. Bainbridge then sexually assaulted Crespin by having sexual relations with her. Neither Fierro nor Bainbridge used physical force or otherwise physically restrained Crespin prior to or while having sexual relations with her. Bainbridge, however, knew that having sexual relations with Crespin was wrong because he knew she was a minor; he had expressed these feelings earlier to Fierro.

{7}     Sometime later, Crespin left Fierro's home. She had extra clothes in her backpack, and she dressed in those clothes before she left. She went to the closest Wal-Mart and called her cousin to pick her up. Crespin then reported the sexual acts to her mother and was taken to the emergency room. Fierro initially had placed the clothes that Crespin had left in the attic of his mother's home, but later moved and hid them under the seat of the vehicle in which they had ridden to get to the home.

{8}     Fierro and Bainbridge were subsequently arrested and charged with a number of crimes based upon these events. In early 2011, Bainbridge pled guilty to bribery of a witness, tampering with evidence, conspiracy to commit criminal sexual

3

penetration in the second degree, conspiracy to commit tampering with evidence, criminal sexual penetration in the fourth degree, and conspiracy to commit false imprisonment. In late 2011, Fierro pled guilty to bribery of a witness, tampering with evidence, conspiracy to commit criminal sexual penetration in the second degree, conspiracy to commit tampering with evidence, false imprisonment, and conspiracy to commit false imprisonment.

{9}     In late 2012, Crespin's attorney notified Safeco that Crespin had been kidnapped and sexually assaulted in February 2009, and made a demand for uninsured motorist coverage under the policy that Safeco had issued to Crespin's mother. Crespin was an insured under the policy. The uninsured motorist provision in the policy provides in relevant part:

> We will pay damages for which an insured is legally entitled to recover from the owner or operator of an:
>
> 1. Uninsured motor vehicle or underinsured motor vehicle because of bodily injury:
>
>> a.     sustained by an insured; and
>> b.     caused by an accident.
>
> The owner's or operator's liability for these damages must arise out of the ownership, maintenance, or use of the uninsured motor vehicle or underinsured motor vehicle.

Safeco denied Crespin's claim. Crespin subsequently filed a complaint for personal injury and declaratory judgment against Safeco, Bainbridge, and Fierro.

4

{10} The district court held a two-day bench trial in May 2016. Following completion of Crespin's presentation of her case-in-chief, Safeco moved pursuant to Rule 1-041(B) NMRA for involuntary dismissal of her claims against it. The court orally ruled that it would grant the motion.

{11} The district court thereafter entered findings of fact and conclusions of law consistent with that ruling. Based on the foregoing facts, the court generally concluded that Crespin had not established the necessary causation required for liability under Safeco's uninsured motorist provision, i.e., Crespin's injuries did not arise out of the use of the uninsured vehicle. First, there was no sufficient causal nexus between the use of the vehicle and the resulting harm. The court emphasized that the vehicle was used only to transport Crespin to Fierro's mother's house: "[Crespin] was not kidnapped by Fierro and Bainbridge or otherwise taken by force to the site of the sexual activity and sexual assault" and thus the vehicle was not an "active accessory" in causing the injury. Second, the events that occurred after Crespin, Fierro, and Bainbridge arrived at Fierro's home broke the causal link that may have existed between the use of the vehicle and the alleged harm. The sexual assault by Bainbridge occurred after the three exited the vehicle and went inside the house and the vehicle was only used to transport Crespin. The court further ruled, however, that Bainbridge committed the intentional tort of sexual assault against

5

Crespin and that Crespin was entitled to a judgment in the amount of $10,000 against him.

{12} The district court entered final judgment in favor of Safeco on Crespin's claims against it but in favor of Crespin, in the amount of $10,000, on her claims against Bainbridge. Crespin now appeals the portion of the judgment concluding that Safeco's policy of insurance does not provide uninsured motorist coverage for the incident at issue.

**DISCUSSION**

{13} Crespin challenges the district court's causation conclusions. Using the analysis established in *Britt v. Phoenix Indemnity Insurance Co.*, 1995-NMSC-075, 120 N.M. 813, 907 P.2d 994, she argues that her injuries and damages arose out of the use of the uninsured vehicle, and thus were covered by the Safeco policy's uninsured motorist provision, because: (1) there was a sufficient causal nexus between the use of the uninsured vehicle and the sexual assault of Crespin; and (2) no act of independent significance broke the causal link between the use of the uninsured vehicle as part of Fierro's and Bainbridge's plan to sexually assault Crespin and her resulting emotional injuries. These arguments were preserved by Crespin both in her response to Safeco's motion for summary judgment and at trial. *Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 ("To

6

preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the [district] court on the same grounds argued in the appellate court.").

{14}     Rule 1-041(B) provides:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings[.]

In ruling upon the motion the court is not bound to give the plaintiff's evidence its most favorable aspect, but rather should give it such weight as it is entitled to receive. *See Mayer v. Smith*, 2015-NMCA-060, ¶ 8, 350 P.3d 1191. If challenged on appeal, the court's findings will be examined only to the extent necessary to determine whether they are supported by substantial evidence. *Id.* ¶ 9. The district court's legal conclusions will be reviewed de novo. *See Camino Real Mobile Home Park P'ship v. Wolfe*, 1995-NMSC-013, ¶ 14, 119 N.M. 436, 891 P.2d 1190 (indicating that Rule 1-041(B) NMRA dismissals will be reversed if based on an erroneous conclusion of law)*, overruled on other grounds by Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 2013-NMSC-017, ¶ 14, 301 P.3d 387; *Tex. Nat'l. Theatres, Inc. v. City*

*of Albuquerque*, 1982-NMSC-004, ¶ 19, 97 N.M. 282, 639 P.2d 569 (holding that, where legal conclusion is challenged on appeal, "the standard for review is whether the law was correctly applied to the facts, viewing [the facts] in a manner most favorable to the prevailing party"); *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960 (holding that in reviewing a mixed question of law and fact, the appellate court will "review de novo the [district] court's application of the law to the facts in arriving at its legal conclusions").

**A.      Legal Framework**

**1.      New Mexico Case Law**

{15}      *Britt* is the seminal New Mexico case that articulates the test "for determining whether intentional conduct and its resulting harm arises out of the use of an uninsured vehicle." 1995-NMSC-075, ¶ 15. In *Britt*, a minor traffic collision resulted in a physical altercation between the passengers of the vehicles. The plaintiff, who was a passenger of the insured vehicle, suffered injuries when a passenger of the uninsured vehicle stabbed him through the vehicle's open window. *Id.* ¶ 2. The plaintiff sought indemnification for his medical bills from the insurance company that had issued a policy covering the vehicle in which he was riding. *Id.* ¶ 3. The uninsured motorist provision of that policy stated, similar to the language of the Safeco policy at issue here, that the insurer "[would] pay damages which an insured

8

person is legally entitled to recover from the owner or operator of an uninsured motor vehicle" for "accidents arising out of the ownership, maintenance or use of the uninsured motor vehicle." *Id.* (alteration, internal quotation marks, and citation omitted).

{16} The *Britt* Court adopted the three-part causation analysis set forth in *Continental Western Ins. Co. v. Klug*, 415 N.W.2d 876, 878 (Minn. 1987):

> [A] court first considers whether there is a sufficient causal nexus between the use of the uninsured vehicle and the resulting harm. Such a causal nexus requires that the vehicle be an active accessory in causing the injury. If a court finds that there is a sufficient causal nexus, then it should next consider whether an act of independent significance broke the causal link between the use of the vehicle and the harm suffered. Finally, the court must consider whether the use to which the vehicle was put was a normal use of that vehicle. For example, transportation would be a normal use, whereas use of a parked car for a gun rest would not be.

*Britt*, 1995-NMSC-075, ¶ 15 (internal quotation marks and citations omitted).

{17} Applying this test to the facts of the case, the *Britt* Court determined that while the first and the third elements arguably were satisfied, it was unclear whether the altercation between the plaintiff and the passenger in the other vehicle amounted to an act of independent significance:

> [W]e conclude that there well may have been a sufficient causal link between the use of the uninsured vehicle for transportation and [the plaintiff]'s injuries. What is less clear, however, is whether the attack by the passengers was an act of independent significance sufficient to break this causal link. . . . If, as [the plaintiff] asserted, the unidentified driver

9

intentionally rammed [the vehicle in which the plaintiff was riding] in complicity with the assailants . . . in order to facilitate the attack, then the assailants' actions probably did not constitute an "independent intervening cause" sufficient to cut off the nexus between the driver's actions and [the plaintiff]'s injuries. If, on the other hand, the collision was accidental and the assailants developed the intent to attack [the plaintiff] after the collision, perhaps due to hot tempers resulting from the collision, then their actions broke the causal link between the use of the vehicle and [the plaintiff]'s injury.

*Id*. ¶ 16.

{18} Several New Mexico and federal court decisions have applied *Britt* and in doing so given meaning to the sufficient causal nexus or "active accessory" prong of the causation test. *Farmers Ins. Co. of Arizona v. Sedillo*, 2000-NMCA-094, ¶ 1, 129 N.M. 674, 11 P.3d 1236, and *Barncastle v. American National Property & Casualty Cos.*, 2000-NMCA-095, ¶ 1, 129 N.M. 672, 11 P.3d 1234, which were decided on the same day, provided this Court "with the opportunity to explain when uninsured motorist coverage is available under circumstances in which the use of the vehicle is somewhat attenuated from the incident." In *Sedillo*, an uninsured driver of a pickup truck sped through a stadium parking lot where a tailgate party was taking place. 2000-NMCA-094, ¶ 2. The truck passed close by the defendant's daughter and then parked some distance away. *Id.* The defendant approached the parked truck and, in response to the threatening demeanor of the two passengers who had gotten out of the vehicle, punched one of them. *Id.* ¶ 3. A fight ensued, and the defendant sustained

10

severe injuries. *Id.* In a declaratory judgment action brought by the insurance company, the defendant claimed coverage under the uninsured motorist provisions of the automobile liability policy that provided coverage for his vehicle. *Id.* ¶ 4. After reviewing the *Britt* test, the *Sedillo* court concluded, without discussion, that the pickup truck was not an "active accessory" in the assault and that the defendant's claim therefore failed for lack of sufficient causal nexus. *Id.* ¶ 9.

{19} In contrast, in *Barncastle*, an assailant pulled up next to the insured victim's stopped car, walked to the victim who was driving, shot the victim through the driver's door window, returned to the assailant's vehicle, and sped away. 2000-NMCA-095, ¶ 2. We concluded that the assailant's uninsured vehicle was an "active accessory" to the assault because "[t]he driver of that vehicle used it to get into a position where [the a]ssailant could get out and shoot [the victim,]" and then escaped from the scene at a high velocity in it, rendering the automobile an *integral element* of the shooting. *Id.* ¶ 9.

{20} *Barncastle* relied on *State Farm Mutual Automobile Insurance Co. v. Blystra*, 86 F.3d 1007, 1010-14 (10th Cir. 1996), which involved a drive-by shooting and applied New Mexico law. In *Blystra*, the insured victim, a pedestrian, was shot by a passenger or the driver of a truck as it drove by the victim. 86 F.3d at 1009. In holding that the truck was an active accessory, the court observed that "[w]hen an

11

automobile is used by an assailant to undertake a drive-by shooting, the automobile is almost by definition an 'active accessory' to the assault. Through the use of an automobile, a drive-by shooter *achieves several advantages* in the commission of his crime that would otherwise be unavailable to him." *Id.* at 1012 (emphasis added).

{21}     In *Hartford Insurance Co. of the Midwest v. Estate of Tollardo*, 409 F. Supp. 2d 1301, 1305 (D.N.M. 2005), the court applied the *Britt* causation test to determine whether uninsured motorist coverage extended to the murder of three persons in an insured vehicle that was parked in a gas station parking lot. The genesis of the crime was an argument over drugs and money. *Estate of Tollardo*, 409 F. Supp. 2d at 1302-03. The assailant had driven around in an uninsured truck looking for the victims. *Id.* at 1303. Eventually he gave up and decided to return home. *Id.* On his way home, he saw the victims' vehicle at a gas station; he attempted to turn into the gas station parking lot but "jumped over a curb and slammed into a pole." *Id.* at 1303-04 (internal quotation marks and citation omitted). He got out of the truck, ran across the length of the parking lot, and shot and killed three people inside the vehicle. *Id.* at 1304.

{22}     The court concluded that these facts lacked certain features New Mexico courts have relied upon to conclude that a vehicle is an active accessory. *Id.* at 1310-11. First, at the time the assailant spotted the victims in the parking lot, he was not using

the truck to search for them; instead, he had given up on the search. *Id.* at 1309. Second, because the assailant had driven his truck into a pole, he could not use the truck to his advantage. *Id.* On the contrary, he could not conceal his identity and weapon and approach the victims without being noticed, and he could not use the truck to commit the shooting. *Id.* at 1309-10. Further, citing Minnesota case law, which it reasoned New Mexico courts would find persuasive given our Supreme Court's reliance in *Britt* on *Klug* and other decisions from that state, the *Estate of Tollardo* court concluded that "mere use of a vehicle for transportation" to or from the scene of a crime does not satisfy the active accessory requirement. *Id.* at 1310. On this basis, the court ruled that the truck was not an active accessory and thus the victim's injuries did not arise out of the use of the truck. *Id.* at 1312.

**2.     Uninsured Motorist Coverage for Sexual Assault**

{23}     Two decisions by California state courts inform our consideration of when sexual assault can arise out of the use of a vehicle as a basis for establishing uninsured motorist coverage.

{24}     In *American National Property & Casualty Co. v. Julie R.*, 90 Cal. Rptr. 2d 119, 120 (Cal Ct. App. 1999), the assailant took the victim to dinner in his uninsured car. After they finished dinner and left the restaurant, the assailant pulled the car off the road and parked it against a fence so that the passenger side door could not be

13

opened, and then sexually assaulted the victim. *Id.* at 120-21. She could not open the door because it was locked as well as blocked by the fence and, due to the position and other characteristics of her seat, was otherwise unable to escape the confines of the car. *Id.* at 120-21. The victim subsequently made a claim for uninsured motorist coverage under an automobile insurance policy issued to her father; to be covered, her injury had to "result from the use of the [uninsured] vehicle." *Id.* at 121 (omission, internal quotation marks, and citation omitted). The court construed "result from" to mean the same as "aris[e] out of." *Id.* at 122.

{25}    The court reasoned that "[t]here must be a causal connection between the use of the vehicle and the injury." *Id.* at 122. Further, the court determined that the use of the vehicle must be "a predominating cause or a substantial factor in causing the injury[,]" *id.* at 123 (internal quotation marks and citation omitted), a standard similar to the "sufficient causal nexus" test established in *Britt*. The court then identified the three ways in which the vehicle was used in connection with the infliction of the victim's injury: "It was transportation to and from the scene of the assault. It was parked along a chain-link fence, restricting egress from the passenger side of the car. And it served as a confining locale for the rape." *Id.* The court categorically ruled that the first use did not satisfy the predominating cause/substantial factor test:

> Use of a vehicle as transportation to the scene of an injury does not
> establish a sufficient causal connection between the use and the injury.

14

> The mere transportation of a tortfeasor to a site where he commits a tort after departing from the uninsured vehicle does not establish the requisite causal relationship.

*Id.* at 123 (alteration, internal quotation marks, and citation omitted). The court also found that the other uses of the vehicle were "incidental to" and not a substantial causal factor in the attack and the victim's injuries. *Id.* On this basis, the appellate court affirmed denial of the uninsured motorist claim. *Id.* at 127.

{26} *R.A. Stuchbery & Others Syndicate 1096 v. Redland Insurance Co.*, 66 Cal. Rptr. 3d 80 (Cal. Ct. App. 2007), presents a fact pattern that is analogous to that of the case at bar in that the victim was not subjected to any force or violence until after she left the vehicle and entered a dwelling. *Id.* at 82. The victim, who was sixteen years old at the time, had run away from home. *Id.* In the early hours of January 12, 2000, she was walking around the streets of San Francisco, looking for a shelter for runaways or homeless people. *Id.* She saw the man who turned out to be her assailant standing in front of a shuttle vehicle. *Id.* He said he would take her to a shelter and she entered the shuttle. *Id.* The assailant instead drove to his apartment; he told the victim that the shelters were closed until 6:00 a.m. but that she could sleep in his apartment while he returned to work. *Id.* She agreed, walked up a flight of stairs and went into his apartment, whereupon the assailant sexually assaulted her. *Id.*

15

{27} The plaintiff, the shuttle owner's general liability insurer, paid significant sums to settle the victim's claims against the owner of the shuttle, then brought suit against the shuttle owner's automobile liability insurer for indemnification. *Id.* at 82-83. The defendant had insured against liability "resulting from the ownership, maintenance or use of a covered [vehicle]." *Id.* at 83 (internal quotation marks omitted). Thus, although the language arose out of a general liability policy, the court construed the same causation terminology that was present in the uninsured motorist provision upon which Crespin grounded her claim. The court reiterated the holding in *Julie R.* that "the mere use of the vehicle as transportation to the scene of the injury did not establish a sufficient causal connection between the use and the injury." *R.A. Stuchbery*, 66 Cal. Rptr. 3d at 84-85 (internal quotation marks and citation omitted). The court then determined that there was no coverage under the defendant's policy: "As in *Julie R.*, the . . . shuttle was merely used to transport the victim to the locale of the rape. Her injury resulted from [the assailant's] conduct and his intent to rape the plaintiff in his apartment, not from the 'use' of the shuttle." *Id.* at 85.

**B.      The District Court Did Not Err in Ruling That There Was Not a Sufficient Causal Nexus Between the Use of the Uninsured Vehicle and the Sexual Assault of Crespin.**

{28} Crespin stresses that Bainbridge admitted in his deposition that he and Fierro would not have picked Crespin up from school had they not had use of a vehicle. She

16

further emphasizes that it was Bainbridge's and Fierro's plan all along to have sexual relations with Crespin. She urges that the use of the uninsured vehicle therefore was an integral element in facilitating the crimes that were committed upon her, and thus the vehicle was an active accessory in inflicting the harm against her. For the following reasons, we disagree.

{29} Fierro's mother's car was not an integral element of the sexual assault. The sexual assault did not occur in the car. On the contrary, Fierro, Bainbridge, and Crespin each had voluntarily exited the car and gone into the house for a considerable amount of time—more than twenty minutes—before the sexual assault had occurred. In contrast to *Britt*, *Blystra*, and *Barncastle*, the vehicle did not provide Bainbridge with any physical or proximal advantage in committing the sexual assault.

{30} Fundamentally, the only nexus between Fierro's mother's vehicle and Bainbridge's sexual assault on Crespin is that the vehicle was the means of transporting Fierro, Bainbridge, and Crespin to Fierro's mother's home, where the assault took place. But as is articulated in *Estate of Tollardo* and the multiple decisions from Minnesota that it found persuasive for purposes of applying *Britt*'s sufficient causal nexus standard, as well as in *Julie R.* and *R.A. Stuchbery*, the mere fact that the vehicle is used to transport the assailant and/or the victim to or from the scene of the intentional tort is not a sufficient connection. On the contrary, the three-

part structure of the *Britt* test indicates that, while normal use of the vehicle for transportation purposes is one of the necessary predicates to uninsured motorist coverage, that requirement is separate from and by itself does not also satisfy the active accessory element. We are aware of no court that has reached a contrary conclusion. In *Britt*, for example, the vehicle in which the assailant was riding rammed the vehicle in which the victim was riding, and the attack on the victim occurred immediately thereafter. 1995-NMSC-075, ¶ 2. And in *Barncastle* and *Blystra*, the assailants' vehicles were used to approach the victims without being noticed, get into a position where the assailants could shoot the victims, and then escape without being identified or apprehended.

{31}     The fact that Fierro and Bainbridge had planned on having sexual relations with Crespin after they transported her to Fierro's mother's house, i.e., they used the vehicle with the intent of committing the sexual assault, does not alter the analysis. The *use* of the vehicle—solely to transport the assailant and the victim to the scene of the tort—remains the same. We acknowledge that in *Britt*, our Supreme Court noted that if the ramming of the vehicle in which the victim was riding was intentional as opposed to accidental, that fact likely would establish that the assailant's subsequent attack on the victim was not an act of independent significance that broke the causal link between the use of the vehicle and the victim's injuries. *Id.*

18

¶ 16. However, the intent, if present, would be coupled with the use of the uninsured vehicle as a weapon. To our knowledge, no court has concluded that an intentional tort arose out of the operation or use of a vehicle solely because the tortfeasor planned or intended to use the vehicle to travel to the place where he or she would commit the tort. *Cf. Lattanzi v. Travelers Ins. Co.*, 650 N.E.2d 430, 432 (Ohio 1995) ("That the assailant intended to harm [the victim] and that he intended to use her automobile to take her to a place where he could harm her is not disputed, nor is it relevant.").

{32}     Similarly, the fact that Bainbridge testified that he and Fierro would not have picked up Crespin at her school had they not had use of a vehicle is not determinative. The test in New Mexico is a "sufficient" causal nexus that makes the vehicle an "*active* accessory" to the tort. *State Farm Insurance Co. v. Bell*, 39 F. Supp. 3d 1352 (D.N.M. 2014), on which Crespin relies, is distinguishable. In *Bell*, a dog that was in the back seat of an uninsured vehicle bit a child who attempted to hug the dog through one of the car windows. *Id.* at 1354. The dog felt threatened because he was in a confined space in the vehicle thus making him territorial over the vehicle. *Id.* at 1358. The fact that the dog was territorial transformed the vehicle from being the mere situs of the injury into a contributing factor to the bite. *Id*. The court held that the vehicle was an active accessory to the bite and reasoned that this was more than simply transporting the dog in the vehicle. *Id.* In contrast to *Bell*, here Crespin left the

19

vehicle a considerable amount of time prior to the assault by Bainbridge; the vehicle did not play a part in the assault, and instead the vehicle was used only to transport Fierro, Bainbridge, and Crespin to the site of the sexual assault. *Bell* does not support the proposition that an uninsured vehicle constitutes an active accessory to the commission of an intentional tort solely because use of the vehicle was necessary to transport the assailant and/or the victim to the location where the tort was committed.[1] *Cf. Lattanzi*, 650 N.E.2d at 432 (rejecting but-for analysis for determining whether rape arose out of use of uninsured vehicle).

**CONCLUSION**

{33}    We hold that, under the facts of this case, the use of Fierro's mother's uninsured vehicle to transport Fierro, Bainbridge, and Crespin to Fierro's mother's house did not make the vehicle an active accessory to Bainbridge's subsequent sexual assault of Crespin. Because it is unnecessary to resolution of the appeal, we do not

---

[1] As noted above, after Crespin had left Fierro's mother's house, Fierro hid Crespin's clothes in the vehicle in which Fierro, Bainbridge, and Crespin had traveled from Crespin's school to the house. Crespin has not advanced this fact as support for her contention that the vehicle was an active accessory to the commission of the sexual assault, and thus any such argument would be waived. *See State v. Correa*, 2009-NMSC-051, ¶ 31, 147 N.M. 291, 222 P.3d 1 ("On appeal, issues not briefed are considered abandoned, and we do not raise them on our own."). Moreover, we do not see how the position could be maintained. Fierro's act of hiding Crespin's clothes was not part of the sexual assault crime and tort, but rather presumably the basis for the charge of tampering with evidence, which was not the basis for Crespin's claim of injury.

address the district court's additional determination that acts of independent significance broke the causal link between the use of the vehicle and the harm suffered.

{34}    We affirm the district court's judgment in favor of Safeco that its policy of insurance does not provide uninsured motorist coverage for the incident at issue.

{35}    **IT IS SO ORDERED.**

_____
**HENRY M. BOHNHOFF, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Judge**

_____
**EMIL J. KIEHNE, Judge**