# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2020-NMCA-001**

**Filing Date: August 13, 2019**

**No. A-1-CA-36619**

**STATE OF NEW MEXICO ex rel.**
**OFFICE OF THE STATE ENGINEER,**

      Plaintiff-Appellee,

**v.**

**TOBY ROMERO,**

      Defendant-Appellant,

**and**

**ELEPHANT BUTTE IRRIGATION DISTRICT,**
**et al.,**

      Defendants.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**James J. Wechsler, District Judge**

Certiorari Granted, December 26, 2019, No. S-1-SC-37903. Released for Publication January 21, 2020.

Domenici Law Firm, P.C.
Pete V. Domenici, Jr.
Reed C. Easterwood
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
Greg C. Ridgley, General Counsel
L. Christopher Lindeen, Deputy General Counsel
Richard A. Allen, Special Assistant Attorney General
Martha Franks, Special Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**VARGAS, Judge.**

**{1}**     Defendant Toby Romero appeals from the district court's memorandum opinion and order adopting the special master's report. In its report, the special master determined that Defendant's underground water rights were forfeited and abandoned, except for a portion used for livestock purposes. We affirm.

## BACKGROUND

**{2}**     This case arose as a subfile proceeding in the course of a general adjudication of water rights in the Lower Rio Grande Basin. At issue in this proceeding is a disputed groundwater right in the Lower Rio Grande Basin perfected by prior appropriation when the Atchison, Topeka, and Santa Fe Railroad Company (the Railroad) drilled and beneficially used water from a well (the Well) in the now-nonexistent town of Cutter, New Mexico.

**{3}**     Defendant's cousin and a limited liability company (the LLC) whose members were Defendant and Defendant's brother (collectively, the Romeros) purchased property where the Well was located (the Property) from the Railroad in 1994, with the goal of selling the water rights. The LLC conveyed its interest in the Property to Defendant and Defendant's cousin later that year, and Defendant's cousin conveyed his interest to Defendant in 1998. Defendant filed a declaration of groundwater rights with the State Engineer, filled out by an employee in the State Engineer's Office, stating that the Well was "used 1921 [through] 1966 for providing water to steam locomotives[,]" and "from 1992 [through] 1995 for livestock watering purposes." Defendant then conveyed the Property to two buyers who conveyed the Property back to Defendant over five years later. The State never sent forfeiture notices to Defendant or his predecessors in title.

**{4}**     In the course of its general adjudication of the water rights in the Lower Rio Grande Basin, the State served Defendant with an offer of judgment stating that the Property had no water right. Defendant objected to the State's offer, claiming a water right in the amount of 394.85 acre-feet per year. The district court referred the present subfile proceeding to a special master, pursuant to Rule 1-053 NMRA.

**{5}**     At trial before the special master, the parties agreed that the Railroad drilled the Well in 1921 to acquire water for its operations at Cutter (the Railroad Right), long before the State Engineer's 1982 extension of the Lower Rio Grande Basin to the area wherein the Property was located. Cutter was a station located between two of the Railroad's terminal points, and the water drawn from the Well was used by the Railroad for its steam locomotives, its workers, the livestock, and the community of Cutter.

Following the switch to diesel locomotives in the late 1940s, the stop in Cutter "was no longer necessary and Cutter was nearly completely abandoned."

**{6}** Defendant relied in part on the testimony and a report by Edward Landreth, an engineer previously employed by the Railroad. Landreth testified that in the context of the 1994 sale of the Property, he alerted Defendant's cousin "to the surplus properties that the [Railroad] was selling off" and that Landreth "may have given [Defendant's cousin] contact information with [a real estate firm], and he took it from there." When asked if he was paid for his advice, Landreth stated, "[Defendant's cousin] . . . may have paid me a little something for wages."

**{7}** Landreth indicated in his report that "the consumption of water from [the Well] and predecessor wells at Cutter would have been extensive between 1881 and the end of the steam locomotive era in 1955." Landreth testified that although he characterized 1955 as "the end of the steam locomotive era," steam locomotives continued to be used, albeit to a much lesser extent. He also stated in his report that "the appurtenances to [the Well] was [sic] retired in place in 1959, as the Town of Cutter had ceased to exist and the railroad track maintenance forces have been relocated."

**{8}** The parties stipulated to the admission of several articles detailing the history of Cutter. One such article stated that after the Railroad switched to diesel locomotives, "the trains no longer stopped to water up or unload cinders. In time the section crews were abolished and the bunkhouse and foreman's house became vacant. . . . [F]inally on June 15, 1956[,] the post office at Cutter was closed. The office had been serving only six families[.] Another stated that the Railroad's "last standing depot was torn down in 1956."

**{9}** A map of the area contained a handwritten notation that read "retired in place AFR 4590-59," and arrows pointing to the Well's pump house, fuel tank, and underground piping. Landreth testified that when property is identified as "retired in place," it is "removed . . . from the tax rolls" and is demolished, and that the notation "AFR" identifies property that is "[a]uthorized for retirement." He further explained that the Railroad retires property primarily to reduce their "maintenance expense and tax exposure[,]" and that when property is retired, the Railroad is "relieved . . . of the obligation to pay property taxes . . . [o]n improvements" and theoretically stops maintaining the property. However, in the context of maintaining the retired property, he noted that "what headquarters do and the local people do can be two different things."

**{10}** Landreth said he did not interpret the map as identifying the Well as having been retired. Instead, he believed that the Railroad retained the Well for future use; otherwise, he stated, it would have been erased from the map, "[j]ust like the depot" that had burned down. The State's witness, John Verploegh, a hydrographic surveyor in the Office of the State Engineer's Litigation and Adjudication Program, testified that he understood Landreth's statement concerning the retirement in place of the Well's appurtenances to reference the "equipment as necessary for the diversion of water from [the W]ell . . . to its place of use, in this case that being the casing, the motor, the pump,

the piping, the tank[.]" In his discussion of the map, Verploegh testified that he interpreted "the dotted lines—with arrows to both the pipeline and a dotted line to what [he] underst[ood] to be the pump house, the reservoir, [the W]ell, and the oil pit, that those dotted lines point[ed] directly to those appurtenances[.]" He understood the notation "retired in place AFR 4590-59" to mean that the appurtenances, "no longer being necessary to the operation of the [R]ailroad, their having been found not necessary for some time at that point, [he] would presume . . . that they are retired in place even inasmuch, as Mr. Landreth put it, on standby . . . in the course of general operation."

{11}    Defendant also called Walter Sam Waldo Johnson as a witness. Johnson testified that sometime between 1962 and 1964, he helped his father repair the Well because it was not pumping water. Johnson testified that he and his father were hired to repair the Well so it could provide water for livestock. On direct-examination, defense counsel asked if Johnson had been told the Well "was always maintained in operational condition[,]" to which Johnson replied:

> Yes. Yes, sir. Whenever we went out there and got it going and got it back into operational condition, the owner said that—whoever, I don't know whether he own [sic] it or leased it. I'm not sure how. I wasn't involved on [sic] that. But it was—they had said that it was two or three years since it had been run.

{12}    A map of the Railroad's lines in New Mexico indicated that in 1966 the Railroad still had a station in Cutter, with a siding that could "handle [eighty-two] cars." Although Landreth could not attest to what extent, if any, water from the Well was used for steam locomotives from 1921 to 1966, nor for "municipal purposes through the [19]70s[,]" he did testify that it was his understanding that the water was used for a road project "sometime probably between [19]75 and . . . [19]86."

{13}    The special master recommended the district court enter a judgment rejecting Defendant's water right claim, and adjudicating Defendant only "a livestock right." The special master found "that the amount of water the Railroad beneficially used from the Well was at most 107.53 acre-feet per year[,]" rather than Defendant's claim of 394.84 acre-feet per year. Further, the special master found that there was no evidence that water from the Well was used for any purpose other than watering livestock between December 31, 1960 and December 31, 1964, and that the Railroad therefore forfeited the non-livestock Railroad Right. The special master also found that the State proved by clear and convincing evidence that the Railroad abandoned the Railroad Right after not using the right for any purpose other than watering livestock for thirty-four years, at which time the Railroad sold the Property to the Romeros.

{14}    The district court adopted the special master's report in its entirety. This appeal followed.

## DISCUSSION

**{15}** Defendant argues the special master erred in finding the Railroad forfeited and abandoned the non-livestock portion of the Railroad Right. We do not address the special master's quantification of the Railroad Right as Defendant does not appeal this issue.

**{16}** Following our discussion of whether NMSA 1978, Section 72-12-8(A) (2002), provides for partial forfeiture, we review the special master's factual findings for substantial evidence. As our holding on the issue of partial forfeiture is dispositive of the matter, we need not reach the abandonment issue.

## Standard of Review

**{17}** A district court may "reject the special master's findings of fact only if they were not supported by substantial evidence." *State ex rel. Office of State Eng'r v. United States* (*Office of State Eng'r*), 2013-NMCA-023, ¶ 16, 296 P.3d 1217; *see* Rule 1-053(E)(2) ("In an action to be tried without a jury the [district] court shall accept the [special] master's findings of fact unless clearly erroneous."). The district court reviews the special master's conclusions of law de novo. *Office of State Eng'r*, 2013-NMCA-023, ¶ 17.

**{18}** This Court "give[s] no deference to the district court's findings but instead consider[s] only whether the special master's findings of fact were supported by substantial evidence." *Id.* ¶ 18. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State ex rel. Reynolds v. Niccum*, 1985-NMSC-016, ¶ 9, 102 N.M. 330, 695 P.2d 480 (internal quotation marks and citation omitted). Further, "[t]he [special] master's findings are presumed to be correct and so far as they depend upon conflicting evidence, or upon the credibility of witnesses, or so far as there is any testimony consistent with the findings, they must be treated as unassailable." *Office of State Eng'r*, 2013-NMCA-023, ¶ 27 (omission, internal quotation marks, and citation omitted). "On appeal, all disputed facts are resolved in favor of the successful party, all reasonable inferences indulged in support of the verdict, all evidence and inferences to the contrary disregarded, and the evidence viewed in the aspect most favorable to the verdict." *State ex rel. Reynolds v. Lewis*, 1973-NMSC-035, ¶ 30, 84 N.M. 768, 508 P.2d 577 (quoting *Tapia v. Panhandle Steel Erectors Co.*, 1967-NMSC-108, ¶ 5, 78 N.M. 86, 428 P.2d 625). "Nor does the fact that there may have been contrary evidence which would have supported a different verdict permit us to weigh the evidence." *Lewis*, 1973-NMSC-035, ¶ 30 (internal quotation marks and citation omitted) (quoting *Tapia*, 1967-NMSC-108, ¶ 5). "We review interpretation and application of constitutional and statutory provisions de novo." *State ex rel. Office of State Eng'r v. Elephant Butte Irrigation Dist.*, 2012-NMCA-090, ¶ 8, 287 P.3d 324.

## Section 72-12-8(A) Provides for Partial Forfeiture

**{19}** Resolving the question of whether New Mexico's forfeiture statute permits partial forfeiture requires that we interpret the relevant statutes. "When this Court construes

statutes, our charge is to determine and give effect to the Legislature's intent." *Badilla v. Wal-Mart Stores E. Inc.*, 2015-NMSC-029, ¶ 12, 357 P.3d 936 (internal quotation marks and citation omitted). "To discern the Legislature's intent, the Court looks first to the plain language of the statute[.]" *Id.* (alteration, internal quotation marks, and citation omitted). "Where the language of a statute is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Id.* (internal quotation marks and citation omitted).

**{20}** "When the statutory language is ambiguous we can consider principles of statutory construction that are employed with statutes that are unclear. In doing so, we must attempt to construe a statute according to its obvious spirit or reason." *Benavides v. E. N.M. Med. Ctr.*, 2014-NMSC-037, ¶ 24, 338 P.3d 1265 (internal quotation marks and citation omitted). "When interpreting a statute, we are also informed by the history, background, and overall structure of the statute, as well as its function within a comprehensive legislative scheme." *Badilla*, 2015-NMSC-029, ¶ 12 (internal quotation marks and citation omitted). "Additionally, we strive to read related statutes in harmony so as to give effect to all provisions." *Benavides*, 2014-NMSC-037, ¶ 24 (internal quotation marks and citation omitted).

**{21}** Section 72-12-8(A), addressing the forfeiture of underground water rights, provides:

> When for a period of four years the owner of a water right in any of the waters described in [NMSA 1978,] Sections 72-12-1 [to] 72-12-28 [(1931, as amended through 2019)] or the holder of a permit from the state engineer to appropriate any such waters has failed to apply them to the use for which the permit was granted or the right has vested, was appropriated or has been adjudicated, the water rights shall be, if the failure to beneficially use the water persists one year after notice and declaration of nonuser given by the state engineer, forfeited and the water so unused shall revert to the public and be subject to further appropriation; provided that the condition of notice and declaration of nonuser shall not apply to water that has reverted to the public by operation of law prior to June 1, 1965.

The statute refers to the forfeiture of "the water rights" without specifying whether such forfeiture may extend to just a portion of an appropriator's water rights. Viewed in isolation, Section 72-12-8(A) is ambiguous in this respect.

**{22}** Section 72-12-8(A)'s history and background, particularly in connection with related statutes, shed some light on the issue of whether it provides for partial forfeiture. In 1907, New Mexico's territorial Legislature enacted the "Statutory Appropriation Act," also referred to as the "Irrigation Code." NMSA 1915, §§ 5654 to 5729 (1907, as amended through 1913); *see, e.g., Yeo v. Tweedy*, 1929-NMSC-033, ¶ 8, 34 N.M. 611, 286 P. 970 (referring to the Act as the "[I]rrigation [C]ode"). The Irrigation Code is concerned with surface water rights, rather than underground water rights. *See, e.g.,*

§ 5654 ("All natural waters flowing in streams and water courses, whether such be perennial, or torrential, within the limits of the State of New Mexico, belong to the public and are subject to appropriation for beneficial use."); § 5671 (requiring the state engineer to "make hydrographic surveys and investigations of each stream system and source of water supply in the State"); § 5673 (providing for suits to adjudicate water rights following "the completion of the hydrographic survey of any stream system"); *see also City of Albuquerque v. Reynolds*, 1962-NMSC-173, ¶ 28, 71 N.M. 428, 379 P.2d 73 (recognizing that "the water code, [1907 N.M. Laws, ch.] 49, dealt only with surface waters"). Nonetheless, it is instructive of the policy of our constitution as it pertains to the use of water in the state.

**{23}** Section 5701 of the Irrigation Code, currently compiled at NMSA 1978, Section 72-5-28(A) (2002), provided:

> When the party entitled to the use of water fails to beneficially use all *or any part of the water* claimed by him, for which a right of use has vested for the purpose for which it was appropriated or adjudicated, except the waters for storage reservoirs, for a period of four years, *such unused water shall revert to the public* and shall be regarded as unappropriated public water.

(Emphasis added.) The Legislature amended this section in 1941 and 1957, adding provisions limiting the applicability of forfeiture "if circumstances beyond the control of the owner have caused non[]use," 1941 N.M. Laws, ch. 126, § 16 (emphasis omitted), and during "periods of non[]use when irrigated farm lands are placed under the acreage reserve program or conservation reserve program provided by [federal law,]" 1957 N.M. Laws, ch. 91, § 1, and amended it again in 1965 to add a notice and declaration requirement prior to the reversion of the unused water to the public. 1965 N.M. Laws, ch. 250, § 1(A). The 1965 amendment also added a provision at the end of the section stating that the notice and declaration requirement "shall not apply to water which has reverted to the public by operation of law prior to June 1, 1965." *Id.* In *State ex rel. Reynolds v. S. Springs Co.*, 1969-NMSC-023, ¶ 9, 80 N.M. 144, 452 P.2d 478, our Supreme Court recognized that partial forfeiture is a potential consequence of non-use of a portion of one's surface water rights. Commenting on this provision of the Irrigation Code, the *S. Springs* Court stated, "the continuance of the title to a water right is based upon continuing beneficial use, and where the right is not exercised for a certain period of time (four years), [Section 72-5-28(A)] declares that *the right to the unused portion* is forfeited." *S. Springs*, 1969-NMSC-023, ¶ 9, (emphasis added).[1]

---

[1] We note that although the section as written in 1907 was entitled "Abandonment—Failure to use water[,]" it was later retitled "Failure to use water—Forfeiture[,]" and the following proviso was added: "[T]hat forfeiture shall not necessarily occur if circumstances beyond the control of the owner have caused non-use, such that the water could not be placed to beneficial use by diligent efforts of the owner." NMSA 1941, § 77-526 (1941); *see also S. Springs Co.*, 1969-NMSC-023, ¶ 10 ("We regret that forfeiture and abandonment have been used interchangeably, as the element of intention is required in the doctrine of abandonment. This is not so in forfeiture."); *Pueblo of*

**{24}**   It was not until 1927 that the Legislature enacted "An Act Declaring Waters in Underground Streams, Artesian Basins, Reservoirs, and Lakes to be Public Waters and Subject to Appropriation; Confirming Existing Rights to the Use of Such Waters, and Regulating Appropriation, Use, and Management Thereof." 1927 N.M. Laws, ch. 182, §§ 1-6 (compiled as NMSA 1929, §§ 151-201 to -205 (1927)). Therein, the Legislature recognized that "[a]ll waters in this state found in underground streams, channels, artesian basins, reservoirs, or lakes . . . are hereby declared to be public waters and to belong to the public[.]" § 151-201. The section went on to state that such waters are "subject to appropriation for beneficial uses under the existing laws of this state relating to appropriation and beneficial use of waters from surface streams." *Id.*

**{25}**   Section 151-201, although later held to violate the New Mexico Constitution's prohibition on extending existing statutes by reference, was intended to subject underground waters to "appropriation for beneficial uses" under the Irrigation Code. *See Yeo*, 1929-NMSC-033, ¶¶ 39-40 (explaining that the "laws of this state" referenced in Section 151-201 "is undoubtedly" referencing the Irrigation Code, and holding that Sections 151-201 to -205 violate Article IV, Section 18 of the New Mexico Constitution). Thus, the Legislature appeared intent on extending Section 5701, then compiled at NMSA 1929, Section 151-154 (1907), to underground waters. *But see El Paso & R. I. Ry. Co. v. Dist. Ct. of Fifth Judicial Dist., ex rel. Chaves Cty.*, 1931-NMSC-055, ¶ 29, 36 N.M. 94, 8 P.2d 1064 ("It is argued that [Sections 151-201 to -205,] . . . was an attempt to control and regulate the relative rights of appropriators from artesian basins as a class by themselves; thus indicating a belief that the original Code did not control. . . . But the acts referred to make no reference to statutory adjudications, do not modify their provisions as to subject-matter or parties, and may as well be urged as proof that the Legislature considered the existing law to be sufficient in that respect.").

**{26}**   In 1931, the Legislature enacted a new underground waters forfeiture statute:

> When for a period of four [4] years the owner of a water right in any of the waters described in this act shall have failed to apply the same to the use for which the right has vested, was appropriated or shall have been adjudicated, such water right shall be forfeited and the water so unused shall revert to the public and be subject to further appropriation.

NMSA 1941, § 77-1108 (1931). Following amendments in 1957, 1959, 1961, 1963, and 1965, the section was written in its current form. 1957 N.M. Laws, ch. 118, § 1 (adding a provision "that periods of non-use when irrigated farm lands are placed under the acreage reserve program or conservation program provided by [federal law] shall not be computed as part of the four-year forfeiture period"); 1959 N.M. Laws, ch. 7, § 1 (specifying which sections describe the water rights involved in this section, including holders of a permit to appropriate waters and their failure to apply the waters "to the use for which the permit was granted" within the reach of forfeiture, and adding a provision permitting the State Engineer to grant extensions of time in which to apply water to

---

*Isleta v. Tondre*, 1913-NMSC-067, ¶ 39, 18 N.M. 388, 137 P. 86 (characterizing the reversion of one's water right to the public under Section 5701 as a forfeiture).

beneficial use); 1961 N.M. Laws, ch. 32, § 1 (limiting the computation of the four-year period during "periods of non-use when water rights are acquired and placed in a water conservation program adopted by an artesian conservancy district"); 1963 N.M. Laws, ch. 195, § 1(A) (amending "shall have failed to apply the same" to read "has failed to apply them," "shall have been adjudicated" to read "has been adjudicated," and "such water right" to read "the water rights"; creating subsections within the section; and placing the provisions added in 1957, 1959, and 1961 into subsequent subsections); 1965 N.M. Laws, ch. 250, § 2(A) (adding a notice and declaration requirement prior to the reversion of the unused water, and a provision that such requirement "shall not apply to water which has reverted to the public by operation of law prior to June 1, 1965").

**{27}** Although the text of Section 72-12-8(A) does not track Section 72-5-28(A) verbatim, its history and background reveal a legislative intent to provide for partial forfeiture. *Cf. Reynolds*, 1962-NMSC-173, ¶ 28 ("The mere fact that the [T]erritorial [L]egislature in the water code, Chapter 49, . . . , dealt only with surface waters . . . does not . . . imply a legislative intention that subsequent statutes dealing with underground waters are to be looked upon and treated entirely separate and apart as though dealing with two entirely different subjects. . . . There does not exist one body of substantive law relating to appropriation of stream water and another body of law relating to appropriation of underground water."). *But see Attorney Gen. of N.M. v. N.M. Pub. Regulation Comm'n*, 2011-NMSC-034, ¶ 10, 150 N.M. 174, 258 P.3d 453 (explaining that courts construe statutes "under the presumption that the [L]egislature acted with full knowledge of relevant statutory and common law" (internal quotation marks and citation omitted)).

**{28}** Indeed, our Supreme Court has held that "no matter how early a person's priority of appropriation may be, he is not entitled to receive more water than is necessary for his actual use." *State ex rel. Erickson v. McLean*, 1957-NMSC-012, ¶ 20, 62 N.M. 264, 308 P.2d 983. Defendant argues that because this holding and any endorsement of partial forfeiture stemming therefrom were made in the context of our Supreme Court's discussion of "[a]n excessive diversion of water, through waste," *id.*, partial forfeiture is limited to cases involving waste. However, any ambiguity regarding whether Section 72-12-8(A) provides for partial forfeiture is eliminated when we consider the statute in conjunction with our constitutional and statutory "beneficial use" provisions. Section 72-12-2, provides that "[b]eneficial use is the basis, the measure and the limit to the right to the use of the waters described in this act." *See* N.M. Const. art. XVI, § 3 ("Beneficial use shall be the basis, the measure and the limit of the right to the use of water."). "Beneficial use is the use of such water as may be necessary for some useful and beneficial purpose in connection with the land from which it is taken." *Hanson v. Turney*, 2004-NMCA-069, ¶ 10, 136 N.M. 1, 94 P.3d 1 (internal quotation marks and citation omitted). As our Supreme Court stated: "By the forfeiture of [water] rights . . . the policy of our constitution and statutes is fostered, and the waters made to do the greatest good to the greatest number. This is on the theory that the continuance of the title to a water right is based upon continuing beneficial use[.]" *S. Springs Co.*, 1969-NMSC-023, ¶ 9 (citing N.M. Const. art. XVI, §§ 1-3, and the previous compilation of Section 72-12-2).

**{29}**    In 2 Clesson S. Kinney, *A Treatise on the Law of Irrigation & Water Rights* § 1118, at 2021-22 (2d ed. 1912), the interplay between forfeiture and beneficial use is discussed:

> Although the general rule is that forfeitures are not favored in law, . . . it has been the policy of the legislatures of the various States and Territories to pass enactments providing for the forfeiture of these rights for the failure or neglect to use them for a beneficial purpose. The very life of this arid country depends largely upon the use of all of the available water supply. Therefore, by the forfeiture of the rights which are claimed by certain parties, but who fail to use them, the ends of justice are met, and the water is made to do the greatest good to the greatest number. This is upon the correct theory that the continuance of the title to a water right is based only upon continuous user; and where a person claims a certain right which he does not use for a certain period of time, the statute declares that *the right to the unused portion* is forfeited and available for the appropriation of others.

(Emphasis added.)

**{30}**    Furthermore, since 2005 the State Engineer has interpreted Section 72-12-8(A) as providing for partial forfeiture. *See* 19.26.2.20(A) NMAC (explaining that under Section 72-5-28 and Section 72-12-8, "[a]ll *or any part* of a water right is subject to forfeiture when a person entitled to the use of water fails to apply water to beneficial use for a period of four or more consecutive years" (emphasis added)); *see also State ex rel. Stratton v. Roswell Indep. Sch.*, 1991-NMCA-013, ¶ 24, 111 N.M. 495, 806 P.2d 1085 ("Persuasive weight is given to long-standing interpretations of a doubtful or uncertain statute by the administrative agency charged with administering the statute." (internal quotation marks and citation omitted)); *cf. In re Waterfall Cmty. Water Users Ass'n*, 2009-NMCA-101, ¶ 20, 147 N.M. 20, 216 P.3d 270 ("Given the complex nature of the statutory regime governing water appropriation in this state, relying on the expertise of the [s]tate [e]ngineer to decipher how [another provision in the Water Code] . . . fits into that scheme is prudent."). We find persuasive the analysis in *State v. Hagerman Water Right Owners, Inc.*, 947 P.2d 400 (Idaho 1997). Faced with a similar question concerning Idaho's forfeiture statute,[2] the Supreme Court of Idaho held that although the statute was ambiguous on the issue of partial forfeiture, it nevertheless provided for partial forfeiture. *Id.* at 406-08. After discussing the persuasive impact of the Idaho Department of Water Resources' interpretation of the forfeiture statute as providing for partial forfeiture, the Supreme Court of Idaho concluded that partial forfeiture promoted the policy goals of Idaho's water law. *Id.* at 407-08. The court explained:

---

2Idaho Code Section 42-222(2) (2004) provides in relevant part: "All rights to the use of water acquired under this chapter or otherwise shall be lost and forfeited by a failure for the term of five (5) years to apply it to the beneficial use for which it was appropriated and when any right to the use of water shall be lost through nonuse or forfeiture such rights to such water shall revert to the state and be again subject to appropriation under this chapter[.]"

If this Court were to find that [Idaho Code Section] 42-222(2) does not authorize partial forfeiture of a water right, once the amount element of a water right is decreed, a water user could hold the water against all subsequent appropriators by using only a part of the water. Such a scheme is inconsistent with Idaho water law, which provides that if a water right is abandoned or forfeited it reverts to the state, following which third parties may perfect an interest therein.

. . . .

Integral to the goal of securing maximum use and benefit of our natural water resources is that water be put to beneficial use. This is a continuing obligation. Partial forfeiture makes possible allocation of water consistent with beneficial use concepts.

*Hagerman Water Right Owners, Inc.*, 947 P.2d at 407-08 (internal quotation marks and citations omitted).

**{31}** In light of Section 72-12-8(A)'s history and background, the policy considerations underlying forfeiture, and the State Engineer's interpretation of the statute, we conclude that Section 72-12-8(A) provides for partial forfeiture.

## Substantial Evidence Supports the Special Master's Findings Regarding Beneficial Use

**{32}** Defendant argues there was insufficient evidence to support the special master's findings regarding beneficial use of the Railroad Right. We note, however, that the State did not challenge the special master's finding that the portion of the Railroad Right used for watering livestock was not forfeited, either in the district court or on appeal to this Court. We therefore review only the special master's finding that the Railroad Right used for non-livestock purposes was not used between December 31, 1960 and December 31, 1964.

**{33}** The evidence indicates that the Railroad no longer stopped at the Cutter station to "to water up or unload cinders" after switching to diesel locomotives, that "the section crews were abolished[,]" that "the bunkhouse and foreman's house [were vacated,]" that Cutter's post office closed and its "last standing depot was torn down in 1956," and that the Well's appurtenances were "retired in place" and "authorized for retirement" in 1959. Landreth's report buttressed these facts, as he stated that the Well's appurtenances were "retired in place in 1959 as the Town of Cutter had ceased to exist, and the railroad track maintenance forces [were] relocated." There was no evidence that the Railroad Right was used for non-livestock purposes after the 1950s.

**{34}** Furthermore, Johnson testified that sometime between 1962 and 1964, the Well was not pumping water. Consequently, he helped his father repair the Well to water livestock, at which time either the owner or the lessee said "it was two or three years

since [the Well] had been run." We acknowledge Defendant's argument that the special master improperly relied on hearsay from Johnson regarding the nonuse of the Well for two or three years. Because Defendant elicited this testimony after asking Johnson if someone had told him whether the Well was maintained in operational condition, Defendant "cannot complain of reversible error [he] invited and thereby caused." *State ex rel. State Eng'r v. United States*, 2018-NMCA-053, ¶ 36, 425 P.3d 723, *cert. granted*, ___-NMCERT-___ (No. S-1-SC-37068, Aug. 13, 2018), *cert. denied*, ___-NMCERT-___ (No. S-1-SC-37100, Aug. 13, 2018). Moreover, Defendant did not object after Johnson provided his answer. *See Gonzales v. Shaw*, 2018-NMCA-059, ¶ 14, 428 P.3d 280 ("In order to preserve an issue for review, a party must have made a timely and specific objection that apprised the district court of the nature of the claimed error and that allows the district court to make an intelligent ruling thereon." (internal quotation marks and citation omitted)); *see also* Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked.").

**{35}**     To the extent Landreth's testimony conflicts with the special master's finding, the special master indicated that it afforded Landreth's testimony "little weight" because of his role in the 1994 sale of the Property. *See Office of State Eng'r*, 2013-NMCA-023, ¶ 27 (explaining that the special master's finding of a witness's credibility "must be treated as unassailable" (internal quotation marks and citation omitted)). Furthermore, although Defendant's declaration of underground water right states that the Well was "used 1921 [through] 1966 for providing water to steam locomotives[,]" the State Engineer employee who wrote this did so based on information provided by Defendant's cousin. Moreover, such "[d]eclarations are only prima facie proof until they are rebutted." *Eldorado Utils., Inc. v. State ex rel. D'Antonio*, 2005-NMCA-041, ¶ 20, 137 N.M. 268, 110 P.3d 76.

**{36}**     To be sure, there was no direct evidence in the record supporting the special master's finding that the non-livestock portion of the Railroad Right was not beneficially used between December 31, 1960 and December 31, 1964. However, indulging all reasonable inferences in favor of, and viewing the evidence in the aspect most favorable to, the verdict, we conclude that the evidence of the Railroad's withdrawal from Cutter and the Town's subsequent cessation to exist, along with the other evidence presented is such evidence as a reasonable mind might accept as adequate to support the special master's finding. We therefore affirm the special master's finding that the non-livestock portion of the Railroad Right was not beneficially used between December 31, 1960 and December 31, 1964, and was therefore subject to forfeiture under Section 72-12-8(A).

**Defendant's Remaining Arguments Regarding the Application of Forfeiture Are Unavailing**

**{37}**     Defendant made several arguments in the district court and on appeal regarding the applicability of forfeiture to the case at hand. These arguments are unavailing.

**{38}** Defendant, citing *McBee v. Reynolds*, 1965-NMSC-007, 74 N.M. 783, 399 P.2d 110, and *Hanson*, 2004-NMCA-069, argues that "[u]ntil a basin is declared by the [State Engineer], the [State Engineer] cannot exercise jurisdiction in connection with its underground waters." These cases explain that the State Engineer exercises jurisdiction and administrative control over a particular groundwater basin by declaring the basin. *See McBee*, 1965-NMSC-007, ¶ 13 (recognizing that the state engineer cannot exercise jurisdiction in connection with underground waters until the state engineer declares a basin); *Hanson*, 2004-NMCA-069, ¶ 2 ("The [s]tate [e]ngineer exercises administrative control over a particular groundwater basin by declaring it and defining its boundaries."). To the extent Defendant relies upon these cases for the proposition that the State Engineer lacked the statutory authority to pursue forfeiture in the Lower Rio Grande for events occurring prior to when the basin was declared in 1981, we decline to review this argument as he has failed to cite any supporting, on-point authority and has failed to clearly explain any such argument. *See Elephant Butte Irrigation Dist.*, 2012-NMCA-090, ¶ 20 (declining to review the defendants' argument that the state engineer lacked the statutory authority to pursue forfeiture for events occurring before 1981, when the Lower Rio Grande Basin was declared, because they failed to cite supporting on-point authority and failed to respond to the state engineer's argument on that point); *Valdez v. Yates Petroleum Corp.*, 2007-NMCA-038, ¶ 24, 141 N.M. 381, 155 P.3d 786 (declining to review a novel argument when the plaintiff failed to cite any on-point authority in support of such argument); *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be."). Moreover, Defendant made no such argument in the district court, and thus did not preserve the issue for review by this Court. *See Gonzales*, 2018-NMCA-059, ¶ 14 (requiring a timely and specific objection apprising the district court of the claimed error to preserve an issue for appeal); *see also* Rule 12-321(A) ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked.").

**{39}** In the district court, Defendant argued for the application of exceptions found at Section 72-12-8(E), (F), and NMSA 1978, Section 72-1-9(B) (2006). However, he has not raised this argument on appeal, and we therefore decline to address the applicability of these exceptions to the case at hand. *See Crespin v. Safeco Ins. Co. of Am.*, 2018-NMCA-068, ¶ 32 n.1, 429 P.3d 968 (noting that "issues not briefed are considered abandoned, and we do not raise them on our own" (internal quotation marks and citation omitted)).

**{40}** To the extent Defendant argues our forfeiture statute should not apply or should apply differently to the Railroad's water rights, he explicitly limited such argument in the district court to abandonment, rather than forfeiture. We therefore decline to further review this argument. *See* Rule 12-321(A). Further, to the extent Defendant argues economic difficulties excused forfeiture of the non-livestock Railroad Right, he made no such argument in the district court. Nor did he argue in the district court that any other circumstances beyond the control of the Railroad or its successors in interest caused nonuse, thereby excusing forfeiture. We therefore decline to review this argument. *See id.*

**{41}** Finally, Defendant argues the district court's "decision . . . constitutes unconstitutional confiscation of private property rights without just compensation" under Article II, Section 20 of the New Mexico Constitution. As Defendant fails to develop his argument beyond this sentence and failed to preserve this issue in the district court, we decline to review it. *See Headley*, 2005-NMCA-045, ¶ 15 ("We will not review unclear arguments, or guess at what [a party's] arguments might be."); *see also State v. Leyva*, 2011-NMSC-009, ¶ 49, 149 N.M. 435, 250 P.3d 861 (reiterating Rule 12-321(A)'s preservation requirements and explaining trial counsel's obligation under New Mexico's interstitial approach to "develop the necessary factual base and raise the applicable constitutional *provision* in [district] court").

**CONCLUSION**

**{42}** For the foregoing reasons, we affirm the district court.

**{43}  IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**M. MONICA ZAMORA, Chief Judge**

**KRISTINA BOGARDUS, Judge**