IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMCA-043

Filing Date: June 11, 2020

No. A-1-CA-37406 and A-1-CA-37902
(consolidated for purpose of opinion)

LEE HUNT, as Personal Representative
of the WRONGFUL DEATH ESTATE OF
SUI YAN, Deceased,

      Plaintiff-Appellee,

v.

THE RIO AT RUST CENTRE, LLC, a
for-profit New Mexico company, d/b/a
THE RIO AT CABEZON; ONPOINTE
BUSINESS SERVICES, LLC, a for-profit
Texas company; and RCZ MANAGEMENT,
LLC, a for-profit Texas company,

      Defendants-Appellants,

and

IPC HOSPITALISTS OF NEW MEXICO,
INC., a for-profit New Mexico company,

      Defendant.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Francis J. Mathew, District Judge

Released for Publication October 5, 2021.

McGinn, Montoya, Love & Curry, PA
Kathy J. Love
Katie Curry
Michael E. Sievers
Albuquerque, NM

for Appellee

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Michelle A. Hernandez
Tomas J. Garcia
Albuquerque, NM

The Checkett Law Firm, PLLC
Paul J. Sheston
Scottsdale, AZ

for Appellants

**OPINION**

**HANISEE, Chief Judge.**

**{1}** This opinion consolidates two appeals arising from a single cause of action in district court brought by Lee Hunt (Plaintiff), personal representative of the wrongful death estate of Sui Yan (Decedent), against The Rio at Rust Center, LLC (The Rio), a Rio Rancho skilled nursing facility, OnPointe Business Services, LLC (OnPointe) and RCZ Management, LLC (RCZ), the management/employment entities[1] for The Rio (collectively, Defendants) following Decedent's death while in Defendants' care. Both appeals raise questions related to arbitrability. Specifically, (1) did the arbitration agreement between Decedent and The Rio contain a valid delegation clause such that the threshold questions of arbitrability should have been left to the arbitrator?; and (2) were the arbitration provisions in either or both the admissions agreement or the arbitration agreement unconscionable under New Mexico case law? In the first appeal, OnPointe and RCZ challenge the district court's order granting partial summary judgment to Plaintiff based upon its rejection of Defendants' affirmative defense regarding arbitration, which asserted that the district court "lack[ed] subject matter jurisdiction as a result of an enforceable arbitration agreement[.]" In the second appeal, The Rio appeals the district court's order denying its motion to compel arbitration. We affirm the district court's orders in both appeals.

**FACTUAL BACKGROUND**

**{2}** Following Decedent's hip fracture, corrective surgery, and rehabilitation, she and her family hoped Decedent could return to living with her son, Stephan Yan, as soon as possible. However, the Yan family understood that a prerequisite to Decedent qualifying for home healthcare, which she needed since she was no longer able to move freely or take care of herself without falling, was admission to a rehabilitation facility for 90 to 100 consecutive days. The Yan family learned that The Rio was accepting new admissions when other such facilities were not at that time. The family was eager for Decedent to be admitted to The Rio rather than being discharged from the facility overseeing her initial recovery and rehabilitation, because any gap in Decedent's admission status

---

1RCZ is an independently contracted management company that handles the day-to-day operations of The Rio. OnPointe is an affiliate of RCZ that acts as an employee leasing entity.

would permanently disqualify her for in-home healthcare and rehabilitation services under Medicare/Medicaid.

{3}    On Friday, October 30, 2015, Decedent was admitted to The Rio to continue her recovery. When she arrived, admissions staff did not ask Decedent to read and sign the necessary admissions paperwork or review it with her, despite there being no information suggesting that Decedent was incompetent or otherwise unable to understand or sign such documentation. Rather, admissions staff was aware that Decedent's primary language was Cantonese and she had only limited fluency in English. For such circumstances, however, The Rio had an interpreter hotline, including personnel able to speak Cantonese. Yet in this instance, The Rio's staff did not use this dedicated resource to communicate with Decedent, and instead sought signatures from Decedent's daughter, Cathy Yan, who possessed a power of attorney for Decedent. In that capacity, Cathy occasionally signed documents on behalf of Decedent, and usually with Decedent present so that Decedent could understand what Cathy was signing on Decedent's behalf, ask any questions she might have, and so Cathy could translate for Decedent what medical providers said.

{4}    On a typical day, the admissions assistant of The Rio, Alexis Elizondo, reviewed admissions paperwork with three to seven residents or family members. Ms. Elizondo would mark beforehand all the locations in the agreement that had to be signed or initialed. Nicole Balido, the admissions director who trained Ms. Elizondo, confirmed that when reviewing admission paperwork with residents or family members, staff members would go through agreements and ask residents to "initial, initial, [and] sign." Ms. Balido also acknowledged that she and Ms. Elizondo would "paraphrase" rather than read portions of the agreement verbatim. Ms. Elizondo claimed that she would go through the boldfaced type in the admission agreement with residents or family members and summarize it in her own words. Neither Ms. Balido nor Ms. Elizondo had formal training, or training from lawyers, about the admissions agreement or the implication of its terms, nor did either possess authority to negotiate any of its terms.

{5}    Per The Rio's policy, the admissions agreement—a standardized, pre-prepared contract—had to be signed within forty-eight to seventy-two hours of a patient's arrival, including weekends. If a resident refused to sign the agreement, the resident would be discharged from the facility. Accordingly, the admissions assistant, Ms. Elizondo, called Cathy to inform her that, as Decedent's power of attorney, Cathy needed to travel to New Mexico as soon as possible to sign the admissions paperwork, and that if Cathy did not sign the paperwork authorizing her mother's care, Decedent would be discharged. Because Cathy lived in Tucson, Arizona at the time, she drove to Albuquerque on Sunday, November 1, 2015, so that she could be present to sign the admissions agreement on Monday morning.

{6}    Cathy visited Decedent on Sunday evening at The Rio, but she did not speak with the admissions personnel, nor was she given any paperwork. The next day, Monday, November 2, 2015, Cathy met Ms. Elizondo to sign the admissions paperwork in the morning, and the meeting lasted less than fifteen minutes. The thirty-page

admission agreement Cathy was provided to initial and sign included an "optional" four-page "Agreement Regarding the Resolution of Legal Disputes and Waiver of Right to Jury Trial" (the Arbitration Agreement), and the signature page of that Arbitration Agreement stated that it "May Be Revoked By Sending Written Notice To The Facility Within Ten (10) Days After Signature." However, Section 22 of the admissions agreement also contained an additional, conflicting, arbitration provision, which was not optional and mandated the arbitration of all disputes between the resident and The Rio. Furthermore, although Defendants maintain that the Arbitration Agreement was optional, the vice president of operations for OnPointe—an entity with a management agreement for The Rio—reported that the Arbitration Agreement had never been questioned, revoked, or refused by any resident or family member. Moreover, at no point was Decedent, as the resident, involved in the discussion or shown the admissions agreement, and it was Cathy's understanding that The Rio required that she alone, as power of attorney, be the one to sign the paperwork.

**{7}** Cathy explained that she felt rushed when she signed the paperwork, but she understood that the admissions agreements had to be signed for Decedent to remain at The Rio, and she did not want her mother to become permanently ineligible for in-home rehabilitation services if Decedent was discharged. Ms. Elizondo did not spend significant time explaining the four-page Arbitration Agreement, nor did she ask if Cathy understood what arbitration is. Ms. Elizondo also did not in any way highlight or emphasize Section 22, the separate and non-optional binding arbitration clause that is standard in all of The Rio's admission agreements.

**{8}** With the admissions paperwork complete, Decedent lived at The Rio from late-October 2015 to mid-February 2016. During her time at The Rio, her health deteriorated, she lost almost twenty pounds, she fell on several occasions, and she suffered a severe pressure ulcer on her sacrum such that the bone was exposed. On February 21, 2016, Decedent was transferred from The Rio to the emergency department at the adjacent Rust Medical Center, a hospital, where she was diagnosed with a severely advanced pressure ulcer. Due to her declining, and then incurable physical condition, Decedent was discharged home to receive palliative care during her final days. She passed away on March 3, 2016.

## PROCEDURAL HISTORY

**{9}** Plaintiff, as personal representative of Decedent's estate, filed a wrongful death suit alleging multiple claims related to the nursing care and treatment Decedent received at The Rio. The Rio filed a motion to compel arbitration, as to which RCZ and OnPointe filed a "notice of joinder." Plaintiff opposed the joinder as improper under Rule 1-007 NMRA and separately filed a motion for partial summary judgment asking the district court to declare that RCZ and OnPointe were not entitled to enforce the Arbitration Agreement in Decedent's admission contract with the Rio because those Defendants were not parties to nor third-party beneficiaries of the Arbitration Agreement. The district court granted Plaintiff's motion for partial summary judgment, concluding as a matter of law that neither RCZ nor OnPointe had a right to enforce the

Arbitration Agreement. The district court also denied The Rio's motion to compel arbitration, finding that the Arbitration Agreement was unenforceable because it was substantively and procedurally unconscionable, and because it was not supported by independent consideration. Defendants appeal the district court's orders, pursuant to NMSA 1978, Section 44-7A-29(a)(1) (2001) (stating that "[a]n appeal may be taken from . . . an order denying a motion to compel arbitration").

**DISCUSSION**

{10}    In their appeal, OnPointe and RCZ contend that although they are not specifically named in the Arbitration Agreement, they are parties or third-party beneficiaries entitled to enforcement of the Arbitration Agreement. We need not resolve this issue, however, because even assuming without deciding that OnPointe and RCZ were parties or third-party beneficiaries to the Arbitration Agreement, we nevertheless conclude that the manner in which arbitration was presented to Cathy was procedurally unconscionable and affirm the district court's denial of The Rio's motion to compel arbitration on that basis. *See Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 47, 150 N.M. 398, 259 P.3d 803 ("Under New Mexico principles of contract law, a finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both."); *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 24, 146 N.M. 256, 208 P.3d 901 ("While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all."). Before explaining our unconscionability analysis, we first address a question that Defendants in both appeals raise—whether there was a valid delegation clause in the Arbitration Agreement such that the questions of arbitrability should have been delegated to the arbitrator.

**I.      The Threshold Questions of Arbitrability Were Not Specifically Delegated to the Arbitrator**

{11}    Defendants contend that there is a valid delegation clause in the Arbitration Agreement, and that the district court erred by not delegating the interpretation of the Arbitration Agreement to the arbitrator. Specifically, RCZ and OnPointe argue that the question of whether they were entitled to enforce the Arbitration Agreement fell within the scope of the delegation clause, and The Rio argued that the validity and enforceability of the Arbitration Agreement should have been decided by an arbitrator. We disagree.

{12}    "Arbitration agreements are a species of contract, subject to the principles of New Mexico contract law." *L.D. Miller Constr., Inc. v. Kirschenbaum*, 2017-NMCA-030, ¶ 18, 392 P.3d 194. "Accordingly, we apply New Mexico contract law in [the] interpretation and construction of the [a]rbitration [a]greement." *Id.* We review questions of contractual interpretation de novo, *Thompson v. Potter*, 2012-NMCA-014, ¶ 12, 268 P.3d 57, and

our task is to determine the meaning of the words in the arbitration agreement and their legal impact. *See Kirschenbaum*, 2017-NMCA-030, ¶ 18.

**{13}** "The general rule is that the arbitrability of a particular dispute is a threshold issue to be decided by the district court unless there is *clear and unmistakable evidence* that the parties decided otherwise under the terms of their arbitration agreement." *Felts v. CLK Mgmt., Inc.* (*Felts I*), 2011-NMCA-062, ¶ 17, 149 N.M. 681, 254 P.3d 124 (emphasis added), *aff'd on other grounds*, *Felts v. CLK Mgmt., Inc.* (*Felts II*), 2012 WL 12371462 (Nos. 33,011, 33,013, Aug. 23, 2012) (dec.); *see Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." (alterations, internal quotation marks, and citation omitted)); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties *clearly and unmistakably* provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (emphasis added)). This position is further embraced by New Mexico's Uniform Arbitration Act, NMSA 1978, §§ 44-7A-1 to -32 (2001), which provides that the court shall determine whether there is an enforceable agreement to arbitrate and issue an order accordingly. Section 44-7A-8.

**{14}** Moreover, even though the parties' agreement is also subject to the Federal Arbitration Act (FAA), we explained in *Felts I* that "although the FAA has limited the role of courts in the arbitration context, certain gateway issues involving arbitration provisions have remained within the purview of judicial review." 2011-NMCA-062, ¶ 17. These gateway arbitrability issues include matters such as the "validity of an arbitration provision, the scope of an arbitration provision, or whether an arbitration agreement covers a particular controversy." *Id.*; *see Strausberg v. Laurel Healthcare Providers, LLC*, 2013-NMSC-032, ¶ 52, 304 P.3d 409 ("Congress did not, however, intend the FAA to entirely displace state law governing contract formation and enforcement. Courts may invalidate arbitration agreements through the application of generally applicable contract defenses, such as fraud, duress, or unconscionability, without violating the FAA." (internal quotation marks and citations omitted)). Yet as has the United States Supreme Court, we too have previously recognized that although questions of arbitrability are typically for the courts to decide, the parties can agree to arbitrate these gateway questions, and where there is "clear and unmistakable" intent to have these issues decided by the arbitrator rather than the court, the delegation provision should be upheld. *Felts I*, 2011-NMCA-062, ¶ 18 (internal quotation marks and citation omitted). Such a delegation provision is "simply an additional, antecedent agreement the party seeking arbitration asks the . . . court to enforce." *Id.* (internal quotation marks and citation omitted). And so, the question we must answer is whether the arbitration provision here included "clear and unmistakable evidence of a delegation clause requiring that questions of arbitrability regarding the validity of the arbitration provision be submitted to an arbitrator." *Id.* ¶ 21.

**{15}** The answer in this instance is no. The clause in the arbitration agreement that Defendants claim constitutes such a delegation provides that "[a]ny disputes regarding the interpretation of this [a]greement shall be submitted to arbitration." Although the clause provides that disputes regarding the *interpretation* of the agreement should be delegated to an arbitrator, the arbitration agreement fails to specify that distinct threshold questions of *arbitrability* (i.e. questions about the validity, enforceability, or scope of the arbitration agreement) should also be resolved by an arbitrator. *See id.* ¶ 22 (stating that "courts must interpret the provisions of an arbitration agreement according to the rules of [state] contract law and apply the plain meaning of the contract language in order to give effect to the parties' agreement" (alteration, internal quotation marks, and citation omitted)). Because the Arbitration Agreement is silent or at most ambiguous about who should decide arbitrability—a question distinct from interpretational analyses—we conclude that the court, and not an arbitrator, bore the authority to decide that issue. We will not "interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options of Chicago, Inc.*, 514 U.S. at 945 (internal quotation marks omitted); *see Heye v. Am. Golf Corp., Inc.*, 2003-NMCA-138, ¶ 14, 134 N.M. 558, 80 P.3d 495 (interpreting an arbitration agreement under rules of state contract law and stating that when an agreement to arbitrate is ambiguous, "[w]e construe ambiguities . . . against the drafter to protect the rights of the party who did not draft" the agreement).

**{16}** Defendants rely heavily on *Rent-A-Center* for the proposition that the United States Supreme Court allows parties to agree to arbitrate "gateway" questions of arbitrability. *See* 561 U.S. at 68-69. True, but the arbitration clause at issue in *Rent-A-Center* specified that "the [a]rbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, *applicability, enforceability or formation* of this [a]greement including, but not limited to any claim that all or any part of this [a]greement is void or voidable." *Id.* at 66 (emphasis added) (alteration, internal quotation marks, and citation omitted). The Court construed that language as an explicit delegation to the arbitrator to decide whether the arbitration agreement was unconscionable. *Id.* at 65. In the present case, by contrast, there is no such specificity in the purported delegation clause demonstrating a "clear and unmistakable" intent to have *arbitrability* decided by the arbitrator instead of the court. We interpret the wording of the clause to be, at best, ambiguous, and therefore, the clause does not "clearly and unmistakably" provide that the threshold question of arbitrability should be decided by arbitrator. Accordingly, such was properly subject to independent review by the district court. *See Felts I*, 2011-NMCA-062, ¶ 17; *see also First Options*, 514 U.S. at 947; *Salazar v. Citadel Commc'ns Corp.*, 2004-NMSC-013, ¶ 8, 135 N.M. 447, 90 P.3d 466 (stating "a prerequisite to compelling arbitration is the existence of a valid agreement to arbitrate").

## II. The District Court Did Not Err in Denying The Rio's Motion to Compel Arbitration

**{17}** Defendants contend that the district court erred in denying The Rio's motion to compel arbitration and in its findings and conclusions stating that the Arbitration Agreement lacked independent consideration, and that it was substantively and procedurally unconscionable. We conclude that the Arbitration Agreement was procedurally unconscionable.

**{18}** We review a district court's denial of a motion to compel arbitration de novo. *Cordova*, 2009-NMSC-021, ¶ 11. Similarly, we evaluate the legal question of whether an arbitration agreement is unconscionable de novo. *Id.* Neither Plaintiff nor Defendants challenge the district court's findings of fact, and consequently, we accept them as true. *See Seipert v. Johnson*, 2003-NMCA-119, ¶ 26, 134 N.M. 394, 77 P.3d 298 ("An unchallenged finding of the trial court is binding on appeal."). Additionally, while we acknowledge federal and state policy favoring arbitration, which Defendants highlight as foundational, we emphasize that state contract law also applies to arbitration agreements, and even the FAA permits arbitration agreements to be invalidated by generally applicable contract defenses such as unconscionability, which state law governs. *See Cordova*, 2009-NMSC-021, ¶¶ 36-38 (holding that the FAA does not preclude our examination of the enforceability of an arbitration agreement based on New Mexico's generally applicable doctrine of contractual unconscionability).

**{19}** "Unconscionability is an equitable doctrine, rooted in public policy, which allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party." *Id.* ¶ 21. Procedural unconscionability "relates to procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms, today often analyzed in terms of whether the imposed-upon party had meaningful choice about whether and how to enter into the transaction." 8 Samuel Williston & Richard A. Lord, *Williston on Contracts* § 18:10 (4th ed. 2019).

**{20}** "Procedural unconscionability may be found where there was inequality in the contract formation." *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 27, 329 P.3d 658. A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent." *Guthmann v. LaVida Llena*, 1985-NMSC-106, ¶ 18, 103 N.M. 506, 709 P.2d 675, *overruled on other grounds by Cordova*, 2009-NMSC-021, ¶ 21. Whether a party has a meaningful choice is "determined by examining the circumstances surrounding the contract formation, including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties." *Guthmann*, 1985-NMSC-106, ¶ 16. Accordingly, when we evaluate whether an arbitration agreement is procedurally unconscionable, we look beyond the four corners of the contract and examine "the particular factual circumstances surrounding the formation of the contract, including the [(1)] relative bargaining strength[; (2)] sophistication of the parties[;] and [(3)] the extent to which either party felt free to accept or decline terms demanded by the other." *Cordova*, 2009-NMSC-021, ¶ 23; *see City of Raton v. Arkansas River Power Auth.*, 760 F. Supp. 2d 1132, 1154 (D.N.M. 2009) ("In analyzing whether a contract or a term in a contract is procedurally unconscionable, New Mexico courts consider several factors,

including the use of high pressure tactics, the relative scarcity of the subject matter of the contract, and the relative education, sophistication and wealth of the parties." (citing *Guthmann*, 1985-NMSC-106)).

**{21}** Furthermore, we also consider "whether the agreement is a contract of adhesion, i.e., a standardized contract offered by a transacting party with superior bargaining strength to a weaker party on a take-it-or-leave-it basis, without opportunity for bargaining." *Strausberg*, 2013-NMSC-032, ¶ 35 (internal quotation marks and citation omitted). "Adhesion contracts generally warrant heightened judicial scrutiny because the drafting party is in a superior bargaining position." *Rivera*, 2011-NMSC-033, ¶ 44. "Although not all adhesion contracts are unconscionable, an adhesion contract is procedurally unconscionable and unenforceable 'when the terms are patently unfair to the weaker party.' " *Id.* (quoting *Cordova*, 2009-NMSC-021, ¶ 33). While unfairness to a party is more typically a matter that relates to substantive unconscionability, our Supreme Court recognizes its applicability in the procedural context as relates to adhesion contracts. *See, e.g.*, *Peavy v. Skilled Healthcare Group., Inc.*, 2020-NMSC-010, ¶ 11, 470 P.3d 218 ("Substantive unconscionability concerns the legality and fairness of the contract terms themselves." (internal quotation marks and citation omitted)).

**{22}** Against this legal framework, Plaintiff first concedes that Cathy is a relatively sophisticated party, considering that she is a business woman who engages with various contracts and holds a bachelor's degree in business accounting and management. However, Plaintiff contends the two remaining factors in the procedural unconscionability analysis—the relative bargaining strength and the extent to which a party felt free to accept or decline terms demanded by the other—overwhelmingly favor Plaintiff because there was gross inequality in the parties' bargaining strength and neither Decedent nor Cathy were "free to accept or decline the terms of the agreement."

**{23}** In this case, the district court made undisputed findings regarding the inequality of the parties' bargaining power. The court found that The Rio's admissions agreement was a "pre-prepared contract" or a "standardized contract" used for all its residents that "must be signed in order to move forward with [a] resident's treatment" and that "[i]f a resident refused to sign the admission agreement, the resident would be discharged from the facility." The district court further found that The Rio had "superior bargaining strength over the resident, or the resident's representative, a weaker party, offering an agreement on essentially a take-it-or-leave-it basis, without a real opportunity for bargaining." These unchallenged factual findings are binding on appeal. *Seipert*, 2003-NMCA-119, ¶ 26. In any case, our review of the record, including the admissions agreement, confirms that in this instance The Rio had vastly superior bargaining power compared to Cathy and that the contract is one of adhesion, warranting heightened judicial scrutiny. *See Rivera*, 2011-NMSC-033, ¶ 44.

**{24}** It is not enough that the parties' bargaining power was unequal, however; we must evaluate whether the inequality was so gross that the party's choice was rendered effectively non-existent before concluding that the contract was procedurally

unconscionable. *See Guthmann*, 1985-NMSC-106, ¶ 18; 8 Williston, *supra*, § 18:10 (stating that procedural unconscionability is "today often analyzed in terms of whether the imposed-upon party had [a] meaningful choice about whether and how to enter into the transaction"). In this inquiry, we look to additional factual circumstances surrounding the formation of the contract, such as the extent to which Decedent and Cathy were free to accept or decline terms of the agreement, as well as the use of high pressure tactics and the relative scarcity of the subject matter of the contract.

**{25}** We note initially that the Yan family was faced with an urgent need to place Decedent in a rehabilitation facility in order to avoid a gap in her admission status so that Decedent would not be foreclosed from receiving needed in-home healthcare down the road. As well, the record establishes that other facilities were not accepting admissions. These facts bear upon whether Decedent and Cathy had a meaningful choice as to whether to accept the terms offered by The Rio. *Cf. Guthmann*, 1985-NMSC-106, ¶¶ 17-19 (rejecting the plaintiff's argument that no meaningful choice existed where the only other local life care center that was acceptable to the decedent had no immediate openings, in part because the decedent had engaged in extensive comparative shopping and neither her health or financial circumstances required her immediate admission). After all, if Cathy refused to sign the agreement, Decedent would have been discharged, and Ms. Elizondo, the admissions assistant who reviewed the documents with Cathy, had no authority to negotiate or modify the terms of the agreement on behalf of The Rio. *See State ex rel. King*, 2014-NMSC-024, ¶ 27 (determining it was procedurally unconscionable when payday loan contracts are prepared entirely by the defendants with superior bargaining power, employees could not modify the terms of the agreement, and these loans are offered to the weaker party—the borrower—on a take-it-or-leave-it basis).

**{26}** Defendants contend that assent to the Arbitration Agreement was "not a condition of admission to The Rio." Defendants also point out that the Arbitration Agreement specifically states the resident or the resident's agent has the right to consult an attorney before signing and that the agreement could be revoked within ten days. However, this characterization wholly fails to account for Section 22 of the admissions contract, which is distinct from the Arbitration Agreement, and, importantly, non-optional, providing that that any legal disputes arising out of the admission agreement "shall be resolved exclusively by binding arbitration." Given these conflicting terms regarding arbitration in the admissions contract, we construe these ambiguities against The Rio as the drafter in order to protect the rights of the resident, the party who did not draft the contract. *See Heye*, 2003-NMCA-138, ¶ 14 ("We conclude that the conflicting terms of the arbitration agreement render it ambiguous [and w]e construe ambiguities in a contract against the drafter to protect the rights of the party who did not draft it."). Moreover, we note that Section 22, rather than being highlighted in some way, was consistent with the other thirty-four sections of the agreement in both format and style. *See Rankin v. Brinton Woods of Frankford, LLC*, 211 A.3d 645, 657 (Md. Ct. Spec. App. 2019) (explaining that the failure to highlight the binding nature of an arbitration clause, when considering the format and location of the clause as simply a numbered paragraph presented in the same format as every other provision supports a finding of

procedural unconscionability). In effect, when Cathy signed the admissions paperwork that included Section 22 for Decedent's admission to The Rio, Cathy waived Decedent's constitutional rights to a jury trial, and Ms. Elizondo did not in any manner emphasize the binding arbitration clause nor did she explain that even had Decedent, or Cathy as her power of attorney, opted to exercise the ten-day right of revocation as to the later Arbitration Agreement, such would have been meaningless under Section 22. We therefore agree with the district court that Section 22 effectively rendered any choice to revoke the "optional" Arbitration Agreement a legal nullity because Cathy was not, in fact, free to decline the arbitration clause in Section 22.

**{27}**   Additional facts buttress our conclusion that neither Decedent nor Cathy felt free to accept or decline terms of the agreement. First, Decedent was never consulted regarding her admissions agreement to The Rio, even though no information suggested that Decedent was incompetent to understand or sign the agreement, and The Rio chose not to use a hotline that was readily available for Cantonese language translation. Decedent simply was not given the opportunity to accept or decline the terms of the admissions agreement herself. Nevertheless, because Cathy had a general durable power of attorney, permitting her to execute contracts and provide consent for any and all medical care and treatment on Decedent's behalf, we focus our attention to the circumstances surrounding Cathy's signing of the agreement.

**{28}**   The district court noted Ms. Elizondo had Cathy initial and sign pre-marked spots in a thirty-page agreement that included a four-page Arbitration Agreement in a matter of fifteen minutes. Our review identifies approximately twenty instances where Cathy either initialed or signed the admissions paperwork. It is unsurprising that the district court found that Cathy felt rushed when she signed the paperwork because the limited time suggests that Cathy barely, if at all, had time to read what she was signing. Moreover, the district court stated that other facilities were not accepting new admissions at the time, and that Cathy understood that she *had* to sign the paperwork for Decedent to remain at The Rio. If Cathy failed to sign the agreement on Monday, November 2, 2015, Decedent would have been discharged from the facility since it was the latter end of the seventy-two-hour timeframe permitted by The Rio to complete the paperwork, and Decedent was initially admitted on Friday, October 30, 2015. If Decedent was discharged, Decedent "would not [receive] necessary rehabilitation services and she would become permanently ineligible for Medicare/Medicaid payment for in-home rehabilitation services." Taken together, these particular facts indicate that Cathy's choice was rendered effectively non-existent because Cathy was not free to decline the terms of the agreement without losing medical coverage for her mother.

**{29}**   Defendants cite *THI of New Mexico at Vida Encantada, LLC v. Lovato* to support their claim that the facts in this case do not support a legal determination of procedural unconscionability. 848 F. Supp. 2d 1309, 1325-26 (D.N.M. 2012). Defendants emphasize Cathy's sophistication in education and business and note that there was no evidence that Cathy requested additional time or explanations, nor that Ms. Elizondo employed sharp practices, high pressure tactics, fraud, or misrepresentation to induce consent. We are unpersuaded.

**{30}** Our review of *Lovato* indicates three key points of distinction. *See id.* First, no separate clause in the admissions agreement there rendered the "optional" arbitration agreement effectively meaningless. Second, the resident in *Lovato* was not faced with the ordeal of finding a facility on an emergency basis, nor with the danger of losing medical coverage as here, and the family there had been looking for a place for a month prior to the resident's admission. *See id.* at 1325. Finally, the arbitration agreement in *Lovato* was only two pages long, with directions in bold, capital letters to "please read carefully." *Id.* (internal quotation marks omitted). However, in our case, the thirty-page admissions agreement included Section 22—a binding arbitration clause—that was no way highlighted in addition to the four-page "optional" Arbitration Agreement.

**{31}** To reiterate, the discussion over a thirty-page agreement here lasted a mere fifteen minutes. *Cf. Barron v. Evangelical Lutheran Good Samaritan Soc'y*, 2011-NMCA-094, ¶ 46, 150 N.M. 669, 265 P.3d 720 (concluding there was no procedural unconscionability where the admissions representative and the resident's agent had an hour-and-a-half to review every section of the arbitration agreement wherein it was specifically explained that the arbitration was not a condition of admission, and there was no evidence that the resident's agent was rushed in signing any of the documents). Fifteen minutes, compared to an hour and a half, is a considerably lesser period of time in which to grasp a thirty-page document that—at least as to arbitration disputes—contained internally conflicting terms. Moreover, in *Barron*, cases from other jurisdictions identifying instances in which procedural unconscionability was determined to be present are comparable to the facts in this case and lend additional support to affirming the district court's finding of procedural unconscionability. *See, e.g.*, *Woebse v. Health Care & Ret. Corp. of Am.*, 977 So. 2d 630, 633 (Fla. Dist. Ct. App. 2008) (holding that procedural unconscionability existed where a nursing home resident's daughter met with the home's administrator for about five minutes, during which time she was presented with a thirty-seven page document that included an arbitration clause, and instructed that her father's continued stay in the home was conditioned upon her signing the papers, which the administrator flipped through and presented the signature pages); *Prieto v. Healthcare & Ret. Corp. of Am.*, 919 So. 2d 531, 532-33 (Fla. Dist. Ct. App. 2005) (agreeing with the trial court's finding of procedural unconscionability where a nursing home resident's daughter was "hurried into signing numerous documents" that were not explained to her). Given the facts of this case, we conclude that the total circumstances under which Cathy was presented with and signed the agreement eliminated her freedom to decline the terms of the agreement or to circumvent the requirement of arbitration. Accordingly, we affirm the district court's order denying The Rio's motion to compel arbitration on procedural unconscionability grounds. Given the dispositive nature of our holding, we decline to reach the additional bases relied upon by the district court for invalidating the Arbitration Agreement here. *See, e.g.*, *Living Cross Ambulance Serv., Inc. v. N.M. Pub. Regulation Comm'n*, 2014-NMSC-036, ¶ 1, 338 P.3d 1258 ("Because we determine that the attorney disqualification issue is dispositive, we do not reach the other issues in this case."); *State ex rel. Office of State Eng'r v. Romero*, 2020-NMCA-001, ¶ 16, 455 P.3d 860 ("As our holding on the issue of partial forfeiture is dispositive of the matter, we need not reach the abandonment issue."), *cert. granted*, 2020-NMCERT-___ (No.S-1-SC-37903, Dec. 26, 2019).

**CONCLUSION**

**{32}**   For the foregoing reasons, we affirm the district court's orders in both appeals.

**{33}   IT IS SO ORDERED.**

**J. MILES HANISEE, Chief Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**ZACHARY A. IVES, Judge**